United States Bankruptcy Court
District of Columbia

**FILED**
OCT 26 2010
Clerk, U.S. District and
Bankruptcy Courts

**In re** The Washington Times LLC        )   Case No. 10-1041
   Alleged Debtor        )
*Other trade names*: washingtontimes.com        )
  The Washington Times        )
  Washington Times National        )   Chapter 11
   Weekly Edition        )
  News World Communications, Inc.        )
  News World Communications        )

## Affidavit of Richard A. Steinbronn

1. I, Richard A. Steinbronn, reside in Herndon, Virginia, and am over 18 years old.

2. On October 21, 2010, I filed an involuntary chapter 11 petition with regard to alleged debtor The Washington Times LLC (TWT), on behalf of three creditors – Washington Times Aviation LLC (WTA), Washington Times Aviation USA LLC (WTA USA), and myself.

3. This affidavit is submitted in opposition to the following:

    a. an emergency motion of TWT to dismiss the chapter 11 petition that I filed on October 21, 2010.

    b. a motion by TWT to shorten time to respond to that emergency motion, and

    c. an emergency motion of TWT to require me as petitioner to post a bond, and request for an expedited hearing.

4. TWT submitted a declaration of Mr. Nicholas Chiaia in support of its various motions.

5. In ¶ 4 of his declaration, Mr. Nicholas Chiaia states that the involuntary petition jeopardizes a "proposed transaction" that is in the final stages of negotiations, involving prospective buyer NWMD.

6. Mr. Chiaia also states in ¶ 4 of his declaration that prospective buyer NWMD is "willing to assume existing obligations, fund ongoing operations and keep the newspaper operating."

7. Mr. Chiaia states that NWMD provided some $2.75 million to fund TWT operations, so that TWT could avoid a shut-down.

8. From what I know, as of the close of business on October 25, 2010, there is no signed agreement of any kind regarding this proposed transaction.

9. From late August 2010 until late September, there was a written term sheet between NWMD and TWT's owner, but it was nonbinding as to any actual transfer of TWT to NWMD. TWT's owner refused to enter into a binding agreement with regard to basic terms of the deal that would keep TWT operations going and assume all TWT liabilities. Under that term sheet, NWMD provided $2 million to cover TWT operations for 30 days, while due diligence and negotiations on transaction documents were to be conducted and hopefully concluded. NWMD had no right of return of this $2 million. NWMD thus provided that $2 million in

the expectation that TWT's owner would negotiate in good faith.

10. The generally nonbinding term sheet was extended for two more weeks – ten business days, until October 7, 2010. For that extension, NWMD on good faith provided another $600,000 to fund TWT operations, but with NWMD still having no guarantee of a deal. TWT's owner would not commit to such a binding deal.

11. The term sheet extension came to an end October 7, 2010, and TWT had at one point planned to shut down TWT operations, going so far as to have final paychecks deposited into the bank accounts of TWT employees on or about October 7, 2010. TWT then reversed those employee final paycheck direct deposits, deciding at that point in time not to close down TWT, in part because NWMD was willing to continue its efforts to reach a deal regarding transfer of TWT to NWMD as an ongoing business, and in part because NWMD provided another $300,000 on or about October 14, 2010, to cover TWT payroll due on or about October 15, 2010. Half of this $300,000, or $150,000, was a loan with a due date of October 21, 2010; the other half was provided by NWMD as yet another good faith gesture toward negotiating and closing the same deal that had been contemplated since late August 2010.

12. One of the issues that has blocked the completion of negotiations on the transaction with NWMD is a broad mutual release that TWT's owner has been insisting on since late August 2010. As of close of business on October 21, 2010,

after the involuntary petition was filed, TWT's owner sought to release at total of ten individuals ("released persons") from certain potential allegations of breaches of duty or alleged wrong-doings relating to TWT. To my knowledge, of these ten released persons, nine have no company or employment positions at TWT, but rather are associated with or work at affiliates of TWT, such as entities in TWT's ownership chain. One such released person is Mr. Chiaia, who holds no position at TWT to my knowledge, but who appears to be directly controlling TWT day-to-day operations and decisions about potential TWT shut-downs. As of close of business on October 21, 2010, TWT's owner also sought releases for five organizations, including the three entities in the ownership chain above TWT. These ten released persons and five released organizations are on the "seller's" side.

13. As part of this mutual release, TWT's owner also sought released from numerous individuals and organizations deemed to be on the "buyer's" side, including four close relatives of the chairman of TWT's ultimate owner, a DC nonprofit. These four relatives have never had any involvement in or control over TWT operations, to my knowledge.

14. Besides the mutual release, another issue that has blocked or impeded the prospective deal is the refusal of TWT's owner to assure in writing that all known obligations of TWT are being disclosed to NWMD. Such disclosure and an

accompanying representation and warranty to that effect are a normal provision in any transaction of this type.

15. In ¶ 6 of his declaration, Mr. Chiaia stated that "Prior to the filing of the Involuntary Petition.... I expected to finalize the negotiations with NWMD and to close... during the week of October 25, 2010."

16. From what I know, as of October 21, 2010, TWT's owner – represented by Mr. Chiaia – had broken off all negotiations with NWMD and was as of that day apparently planning to shut down TWT's operations at the end of the following day, Friday, October 22, 2010. From what I know, only after the involuntary petition was filed on October 21, 2010, did TWT's owner resume negotiations with NWMD for the transfer of TWT to NWMD. And, from what I know as of last night, TWT's owner is now prepared for the first time to eliminate some of the buyer side persons from the proposed mutual release.

17. TWT argues that I have no standing to file a creditor claim on behalf of WTA and WTA USA.

18. From at least 2005 until early November 2009, I was employed as legal counsel for WTA, WTA USA and their affiliates, including their parent entity Times Aerospace International LLC (TAI), and also served as director and secretary for TAI. These three entities – TAI, WTA and WTA USA (TAI Group) – are Delaware limited liability companies with their main place of business in the

5

District of Columbia. During the time I was at the TAI group, TAI and its US affiliates such as WTA and WTA USA each had a corporate-type governing structure, with a board of directors and officers. The directors of TAI and its affiliates had the same rights and duties as directors of Delaware corporations.

19. On November 8, 2009, I was terminated without prior notice from all of my positions in the TAI group, as part of a wrongful takeover and restructuring of the TAI group by persons wrongfully in control of its parent entities.

20. On November 8, 2009, the same persons who wrongfully caused the takeover of the TAI group also caused the top management of the debtor TWT to be removed without prior notice. The persons removed that day included Dr. Douglas D.M. Joo, TWT's chairman, Mr. Thomas P. McDevitt, TWT's president and publisher, and Mr. Keith Cooperrider, Executive VP and CFO.

21. The takeovers of the TAI group and of debtor TWT as of early November 2009 were each wrongful because the changes in TAI group and TWT management and directorships were contrary to the long-standing customary desires and directives of the Founder of TWT, the TAI group, and the ultimate nonprofit owner of the TAI group.

22. This takeover of the TAI group and of debtor TWT was related to the wrongful takeover of the nonprofit owner in early August 2009. That wrongful takeover involved the removal of certain persons (Y) from the nonprofit board in early

August 2009, and the refusal in July 2009 of directors X at UCI (who comprised a majority of the nonprofit board) to consider two other persons (Z) for the nonprofit board as recommended by the nonprofit's Founder.

23. Since early August 2009, Directors X, who control the nonprofit and thus also control TWT, have taken actions that greatly harmed the business and operations of TWT. In particular:

   a. In mid-August 2009, directors X were told in writing by former directors Y and by an organization associated TWT's nonprofit owner that further financial support and investment for TWT would not be forthcoming unless the nonprofit board terminations of Y were reversed, and the board composition reconfigured to that desired by its Founder. Directors X refused to reconfigure the nonprofit board, so as to restore support for various projects such as TWT.

   b. In mid-2009, funds totaling $5.5 million were made available to TWT's parent and those funds were specifically designated to be used for TWT operations at that time. Those wrongfully in control of TWT and it ultimate nonprofit owner at that time refused to use those funds for TWT operations, on the grounds that the funds must be preserved for a possible shutdown of TWT in light of the funding drop at that time – a drop caused by the wrongful acts of those in control of TWT and its nonprofit owner. In recent

7

        days, it was learned that this $5.5 million was never used for TWT operations, but was used for purposes other than support of TWT.

    c.    Directors X are among the individual "released persons" listed on the mutual release as proposed by TWT's owner as of close of business on October 21, 2010.

    d.    The mutual release sought by TWT's owner as of October 21, 2010 seeks to absolve all persons and entities who played a role in misusing the $5.5 million designated exclusively for TWT operations.

24.    All TWT creditors, including WTA and WTA USA, stand to gain by the prospective transaction involving TWT and NWMD, because the known claims of those creditors are likely to be substantially repaid should TWT remain in operation and the deal with NWMD go through.

25.    TWT's value is much enhanced if it stays in operation, and is transferred to NWMD, and TWT's value would be much diminished if it were to be closed down. Thus, all creditors will benefit from the deal proposed by NWMD in good faith since late August 2010.

26.    WTA and WTA USA stand to benefit from the proposed transaction with NWMD, because TWT owes WTA and WTA USA a total of $2 million, and the proposed transaction provides for the payment of certain obligations that TWT had to its affiliates such as WTA and WTA USA.

27. It is my belief that the owner of TWT and those in control of TWT's nonprofit owner have in recent days and weeks held the transfer of TWT to NWMD hostage to unreasonable demands regarding the mutual release, such as the release of numerous individuals who have never worked at or held positions in TWT and who have never been formally involved in TWT's day to day operations, and the release regarding the misuse of the $5.5 million. The very demanding of such a release would not only be of no benefit to TWT or its employees and all of its creditors including WTA and WTA USA, but would be contrary to the best interests of TWT and its creditors, to whom TWT management and its direct owner owe fiduciary duties, given TWT's current insolvency as expressed in Mr. Chiaia's declaration. This is particularly so given that the other entities affiliated with TWT or controlled by Directors X that apparently benefitted from the $5.5 million are solvent and have substantial net worth far beyond $5.5 million.

28. It is also my belief that TWT's owner has not been negotiating in good faith with NWMD, but rather has endeavored to unfairly – and to the detriment of TWT's creditors – extract from NWMD and individuals and entities unaffiliated with TWT blanket releases on various claims of potential or actual benefit to TWT and TWT's creditors, including creditors WTA, WTA USA and myself. Conditioning the transfer of TWT to NWMD on such demands is a breach of duty that TWT's owners and those in control of TWT and its owners owe to the creditors of TWT.

9

29. Similarly, the refusal of TWT's owner to list all known TWT liabilities and obligations as part of a transaction with NWMD creates unwarranted risks for NWMD that can be easily resolved by full disclosure comparable to that required in any bankruptcy proceeding. The lack of such full disclosure at this time could eventually prove fatal to NWMD's efforts to acquire and continue operating TWT, should NWMD find out after acquiring TWT that substantial undisclosed liabilities or claims existed as of the date of acquisition that TWT and its owners were aware of. It is in the best interests of TWT and its creditors that all known liabilities, potential liabilities and potential litigation be disclosed to NWMD at this time, as part of any potential transaction involving NWMD's acquisition of TWT.

_____
Richard A. Steinbronn

Commonwealth of Virginia
County of Fairfax

Subscribed and sworn to before me this 26 day of October, 2010.

_____
Notary Public

SHERRI WITOWSKI
Notary Public
Commonwealth of Virginia
130013
My Commission Expires Sep. 30, 2013

Certificate of Service
On October 26, 2010, at approximately 11:00 AM I delivered a copy of this affidavit to debtor's counsel, Holland & Knight, at the address shown on the attached envelope, which affidavit was stamped as received per copy of page one of affidavit.

10

Richard A. Steinbronn